United States Court of Appeals for the Life Search and Acknowledgement Session, please be seated. Morning, counsel. Morning, ladies and gentlemen. Before we start the call of the calendar today, I have a few preliminary remarks I'd like to make. Today is the very first day of our new colleague, Carlos Bea. It's his very first day sitting with the Ninth Circuit. Judge Bea was recently confirmed by the United States Senate after his appointment by President Bush. And Judge Brisson and I are very pleased to be able to sit with Judge Bea, his first time hearing a case on behalf of the Ninth Circuit. Judge Bea comes to us from the San Francisco Superior Court, where he had a distinguished career. And prior to that, he had a very distinguished career as an attorney here in the city. So with that, I would ask that you all join me in welcoming Judge Carlos Bea, our newest judge, to the Ninth Circuit Court of Appeals. Thank you very much. And with those preliminaries, I'd like to turn to the calendar. Our first case was Roberts v. Knowles, but that's submitted on the briefs. Our next case is Nakamoto v. Ashcroft. Mr. Strack for the petitioner. Good morning, Your Honors. Scott Strack appearing on behalf of the petitioner, who is present in court with her family here today. My understanding is that the court's primary question in this case is the issue of marriage fraud and how it affects this matter. This court has heard several cases and made several rulings regarding the question of legitimate marriages and primarily has come down with the concept that we look at what is the party's intent at the time of the marriage. And in this case, the facts were that the parties married in the Philippines, in the local town of the petitioner, and her husband traveled from the United States, from Honolulu, Hawaii, to the Philippines. Prior to the marriage, they traveled together to the United States Embassy in Manila and obtained a document showing that the husband was free to marry. They came back. They were married in the village, and then they spent a few nights together. He then returned to Honolulu. Then some problems developed, and the parties essentially had a long-distance argument, if you will, over a girlfriend issue. And after approximately 27 months, then finally the petitioner immigrated to the United States. The parties resided together for a couple of days in Honolulu, and then the wife traveled to another island of the Hawaiian Islands, the Big Island of Hawaii, and the husband refused to travel along, even on a short visit. And thereafter, the parties eventually separated and divorced. My client filed for a divorce. There was a cross-complaint for an annulment filed. Right, and the state court in Hawaii granted the annulment petition. Yes, they did. And finding that the marriage was entered in was fraudulent. Well, there was no specific finding in the Hawaii court, and that's one of the problems in this case is you go through all the levels, the Hawaii state court, the immigration judge, and the board. Well, it says in the order of February 18, 1997, in the minute order before the judgment was entered, that the court does find by clear and convincing evidence that the consent of defendant to the marriage is obtained by fraud. They use the word fraud, and they make that statement, but they don't, as required by Hawaii law, they don't specifically set forth how that fraud took place. And the husband in that case and his attorney never specifically pled what the fraud was. What it comes out in the conversation or in the testimony, apparently, is that he was the fraud. Well, fraud was one of the basis for the state court in Hawaii to grant an annulment, wasn't it? Yes. And that seems to be what it says on the document, that that was the basis for the annulment. But substantially, they never make a specific finding as to what that fraud is. And Hawaii statutes require specific findings and specific pleadings of fraud. Well, see, that judgment was appealed to the court of appeal in Hawaii, correct? Right. And it was affirmed, correct? Yes, it was. And quite aside from that, there's certainly evidence in the record, including the letter she wrote right after,  Well, the letter, as we have explained, is a letter essentially of an angry person trying to get back at a person that's hurt them. Yes, that's her explanation. And there is a letter. And the question is, does the I.J. have to believe her explanation? And the I.J. should look at the totality of the evidence. And even as the I.J. notes in her own decision, that it's very unusual to her, and it's unusual, I would think, to this Court, that you would wait a period of 27 months to finally come to the United States, if, in fact, your intent all along was simply to enter into a sham marriage. The idea and the concept of someone who wants to come to the United States and get a green card, and they're so desperate to do so that they'll enter into a fraudulent marriage, is they're going to come as quickly as possible. They're going to do everything possible to wrap this up, to get their green card, and move on with their lives. They don't wait 27 months. Now, admittedly, a small portion of that 27 months can be attributed to the processing time of the immigration service, but that was within a few months, six months or so, that she could have immigrated. And this remaining balance of 21 months or 20 months approximately, she waited because they were having this long-distance argument about the girlfriend. Which was resolved? Yes, it was, otherwise she wouldn't have come. And the husband wanted her to come. He picked her up at the airport. But instead of having a house for her, as he promised, he informs her that, oh, well, I'm living in a studio with my mother, and so we'll stay at your aunt's house, and I'll come visit you, and then everything works out all right. Then we'll get a place together. She leaves, like, immediately. Excuse me? She leaves right away? She stayed for two nights, and then she got a phone call from her uncle on the Big Island who said, come visit. So she says to her husband, let's go. We'll go visit my husband on the Big Island, see what that's like. He says, no, I can't. I have to go back to work. You go ahead and go. So she goes, and then she keeps telling him, come on over. This is very nice. I like it here. He doesn't come over for months, and then finally he does come over. And, of course, another argument develops, and this one is, where do we live? Do we live on Oahu where he has his job, or do we live on the Big Island where she now has a job? But the argument was, where do we live together? There was never any testimony that neither one of them didn't want to be together at that point, and this is post-marriage by quite a bit. Let me just shift your attention for a moment to the statute. As I understand it, once the district director made the decision to remove her conditional status on the basis that she had entered a fraudulent marriage, then it went into a deportation proceedings, a removal proceedings. And she sought a waiver under 216, I think it's C, 4, on a hardship basis. That's how we get to it. And she asserted two bases, one hardship and the one you're talking about, the one you've been addressing, that she entered into the marriage in good faith. Yes. Now, let me ask you a couple of questions. The statute seems to suggest that the determination by the BIA is discretionary here. So I'm curious, do we have jurisdiction? Yes, I believe you do have jurisdiction. The point is that, first of all, the BIA in this case does not even make a review of this case. They essentially write over a little one paragraph that, yeah, what did I.J. say? What I.J. said is fine. And they make no review of it at all. And the I.J. only considers certain facts, and that's one of the problems here in the marriage fraud area, that the I.J. often just picks on one or two facts. In this case, they seem to focus in on the letters, for example, that the Court has already addressed. And they don't look at all of the facts, and they don't present all of the facts. The question is that Judge Pius is asking a statutory jurisdictional question. Right. And by their actions and their lack of review in the full and proper manner, they deprive someone of due process. This Court always has jurisdiction to review questions of due process. What's the due process? I didn't see a due process argument in your petition. What's the due process argument? We did argue due process that by not having a full and fair review, you don't have due process. Due process requires a full, complete, and fair hearing. Well, where was the review short? Well, the BIA was short in the fact that they, from our opinion, they never reviewed the case at all. They let it sit on their desk for two years, and then they write a one paragraph, yeah, the I.J. is correct. That's their review. That's not an independent, full, fair review of the case. The I.J. doesn't give a full review in the fact that she, despite a tremendous amount of evidence that was presented to her, it's clear from the record from our perspective that she focuses in pretty much solely on the letters and says, well, this letter is convincing that that means there wasn't an intent. Counsel, doesn't she also focus in? On finding a lack of credibility of your client because of flat contradictions between her testimony and her court proceedings affidavits? She does reference that, but as I pointed out, on a rather important issue involving the bona fides of a marriage, that is whether they ever had any sexual relations at all. Well, actually, whether or not they have sexual relations is not important to the bona fides of the marriage. You can have a perfectly bona fide, legitimate marriage with no sexual relations whatsoever. The question is, what about lying about it? She never lied about anything, and if you look at the record, her ex-husband is the one that really is lied. Well, she testified in the hearing that she had sexual relations with him, and then in her annulment proceeding, she said she did not. It's not about her annulment proceeding. She didn't have a translator, and she didn't understand. And you can see from the record that she did not. She also wrote in a letter that she did not. Again, this is a letter from an angry person trying to hurt somebody that hurt her. I understand that there may be explanations, but the real question is whether the I.J. was obligated to believe these explanations. There were contradictions, and the I.J. essentially said there are these contradictions, and I don't believe her. Now, can we overturn that? Aside from this problem of whether we even have jurisdiction to do anything here. Yes, I believe you can, because if you look at the totality of the evidence, the conclusion will be drawn that, in fact, the I.J. was wrong. Let's go back to the jurisdictional question. Do I understand your position to be that we don't have jurisdiction except over a due process claim? No, you have jurisdiction over all questions of law. And you have jurisdiction. You see, the government would try to assert that any time the immigration judge or the BIA makes a decision, it's pretty much discretionary, and therefore the law has taken away jurisdiction from this court. There can't be that broad a cloak to cover all of the. . . Well, I think it is odd to have a statute that appears to say that it's up to the Attorney General and the opinion of the Attorney General whether he's in good faith, but that's what it says. Statute does use the term in the opinion of the Attorney General. And the question is whether, under our case law, that locution is enough to lead to the conclusion that this is something beyond our jurisdiction. Well, the Abedini case, I believe, says that you can review and that if the evidence compels the reasonable facts finder to reach a contrary result, that you are allowed to do so. Which case is that? I'm sorry. Abedini, A-B-E-D-I-N-I. And that's under this statute, the current version? No, this is a 1992 case. The statute's changed, hasn't it? I actually gave you the wrong statute. I actually meant the statute of the Act, Section 237A1G, Marriage Fraud. And what Judge Brezon was referring to was unless the alien establishes to the satisfaction of the Attorney General that such marriage was not contracted for the purposes of evading any provisions of the immigration laws, or it appears to the satisfaction of the Attorney General that the alien has failed or refused to fulfill the alien's marital agreement, which in the opinion of the Attorney General was made for the purposes of procuring the alien's admission as an immigrant, we generally don't have jurisdiction to review discretionary decisions of that nature. That seems to give the Attorney General substantial discretion here to make these critical decisions. And we generally don't have discretion now under the Act to review discretionary decisions of that nature. And that's what's of concern. I understand that, but I believe that you have jurisdiction to make sure that the Attorney General exercises his discretion in a constitutional and fair manner. And when he does not do so, you have the ability to overturn that. Except the new statute says that there's no jurisdiction over discretionary decisions. This is what we've been struggling with in other areas as well. I mean, relatively. It's not until new anymore, but relatively new statute. But you can't, as I said earlier, I don't think you can allow the Attorney General to cloak all of his decisions in purely discretionary manners and the methodology in which he gets to those decisions. And if the methodology in which he gets to his discretionary decision is flawed, then this Court must overcome that. So what you're really complaining about is that there was just a single member of the Board in a one-paragraph decision to affirm the IJ's decision? That's a big part of our complaint, yes. I'm sorry? That's a big part of our complaint, yes, as far as the BIA. It's clear to me, at least, that that decision-making process was simply a rubber stamp. And a rubber stamp is not a full and fair hearing that's required under due process. Actually, this review, although it is only signed by one person, it isn't the classic or the streamlining kind of review. It doesn't say that it's just based on the results. So was this a one-person decision? Can we tell that? I can only draw the same conclusion that the Court does, that since it was signed by the one person, it was a one-person decision. Probably is not, actually. Thank you. Thank you. Good morning. May it please the Court. David Dauenheimer on behalf of the Respondent, the Attorney General. Could you address that last point that Judge Berzon just raised about the Board's decision? Was it one member of the Board on behalf of the Board, or was it a streamlining case, a case that was selected for streamlining? I believe it's a streamlined decision. However, it falls under the 3.1E5 provision, which is where an immigration judge may determine that, may provide his own additional reasoning and also adopt and affirm the decision of the immigration judge. So rather than a 3.1A7, which is the traditional streamlining decision, which Judge Berzon referred to, where the Board simply says, we affirm without opinion the immigration judge's decision is the decision for the agency. What happens here is that the immigration judge added some additional reasoning and then also affirmed and adopted the immigration judge's reasoning below. Therefore, this Court would review both the Board's decision and the decision of the immigration judge when examining this case. The additional reasoning that the Board provided was actually that the petitioner is now ineligible for suspension of deportation because she can no longer go. Well, actually, let me move on. This Court was also asking questions regarding whether it has jurisdiction to review this decision at all. We're under 237A1G. That's correct. Isn't that correct? That's correct, Your Honor. This is under the permanent rules. Right. And it falls under the provision for marriage fraud. And as this Court noted, that provision indicates that the alien is considered deportable if it appears to the satisfaction of the Attorney General that the alien failed or refused to fulfill the alien's marital agreement, which in the opinion of the Attorney General was made for the purpose of procuring the alien's admission as an immigrant. That language submits that decision to the Attorney General's discretion. But it doesn't use the word discretion. I don't think to be committing to discretion because it's not like other discretionary decisions, even like exceptional circumstances or whatever. It's a fact-finding. And to say that that's discretionary is mighty peculiar. I would argue that it's not dissimilar from an extreme hardship finding in that the requirement for a good-faith marriage or for the decision is going to require the immigration judge to weigh various factors and come to a decision as to what the intent of the parties were. It's not a solid fact-finding. It's not a solid fact-finding. That's a fact-finding. We do it every day in court. It's a fact-finding. Exceptional circumstances has elements of which doesn't have a standard really as to which it's measured except a very vague one. But intent is something that's found in court every day. And so this is basically an attempt to insulate just ordinary fact-finding from review. Is that basically where we are? Well, even in a suspension or a cancellation case, there's fact-finding that is done by the judge or the immigration judge that is insulated from review by this court in that he has to make certain determinations as to what hardships would actually occur. And those determinations are not subject to review by this court in a suspension or cancellation or removal case. Similarly, in this case, the immigration judge has to make determinations as to the intent of the parties and the evidence of whether this was a good-faith marriage. This language was new in the 96th statute. Is that right? That's correct, Your Honor. Is there any case law that has this particular language and its effect on jurisdiction? I was unable to find any case law that dealt with this particular statute. There is a case, Denton v. Hernandez, in the Supreme Court, which discussed language which is similar in that a court's dismissal of a pro se brief as being frivolous was left to the decision as to whether the court was satisfied that it was frivolous. And the Supreme Court in that decision found that that language meant that that decision by the court was up to the discretion of the court and not subject to review. Similarly ---- Do you remember that case, Denton v. Hernandez? Denton v. Hernandez, Your Honor. Do you remember the year?  It is in the brief, Your Honor. Okay. Counsel, wasn't there a case in September in this district, I mean in this circuit, I guess Stevenson v. INS, an asylum case holding that unless a specific word discretion was used, there was jurisdiction to review? It was an asylum case. With regards to a decision whether to grant asylum? Right. I'm unaware of that particular case, Your Honor, however. The argument in this particular matter is that the language of the statute commits this particular decision to the attorney general's discretion. But it doesn't use the word discretion, does it? It says opinion of, right? That's correct. And that's also similar to the language that's used in cancellation or removal, where the decision with regard to the determination of whether extreme hardship is proven is left to the determination of the attorney general. It doesn't, under the new permanent rules, it doesn't specifically say in the opinion of the attorney general. Turning to the facts of this particular case, with regard to a marriage fraud case, there's little doubt that substantial evidence supports the immigration judge's determination that this particular marriage was not made in good faith. Petitioner testified before the Hawaii court that she didn't marry her husband for love or affection, that she never had desire or intention to marry him, that she never considered herself his wife. That's in the record at 609, 611, 614. She agreed that she only married because her parents wanted her to get married, and they wanted her to come to the United States. Again, in the record at 612 and 617. And she further admitted that she had lied to Mr. Adel Rosario, and that's in the record at 620. When she comes before the immigration court, her story's changed, and now it was a good faith marriage. However, explanation for the difference in her testimony was unpersuasive to the immigration judge and should be likewise unpersuasive to this court. This is not a quasi-judicial lynching, as it was termed by Petitioner in his brief to this court. The immigration judge based her decision on the entire record and noted evidence that was both favorable and unfavorable to the petitioner in this matter. With regard to the delay in coming to the United States, the immigration judge noted that that was a factor that could indicate that the petitioner wasn't just trying to get here as quickly as possible. However, the evidence also indicates that she may not have wanted to come to the United States but was being led to that decision by her parents. So that could also be an equally persuasive explanation for this delay. The immigration judge, however, found that when reviewing the totality of the circumstances and all the evidence that she had, the petitioner did not meet her burden of showing that her marriage was made in good faith. Pending any further questions from the court, that's all I have. Thank you very much. No other questions. Thank you. Thank you, Your Honor. We have one minute. Thank you. Getting to a point that Your Honor raised, the testimony you focused in on whether or not there was a lie, if you will, I think one needs to focus very carefully on the testimony of Mr. Del Rosario. It's very clear that when you compare his testimony, one versus the other, there's no credibility whatsoever for Mr. Del Rosario, yet somehow the immigration judge seemed to have relied upon his testimony to a certain extent. And he talks about being tricked into being married, and yet he talks about consistently wanting to make love to Ms. Nakamoto. And he says, we didn't live together, yet here he admits that he was in the aunt's house for two nights immediately afterwards. This was a situation where she attempted very hard to make a life with this man, and he was the one that didn't want to get together and live in a set place. He was the one that didn't want to agree to a specific place. So she did have an intent to form a marital union. Thank you, counsel. The matter will stand submitted.
judges: Paez, Berzon, Bea